IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION



| | |
|---|---|
| ROBERTO SANCHEZ, | § |
| Petitioner, | § § § |
| v. | § No. 4:15-CV-948-A |
| LORIE DAVIS, Director, Texas Department of Criminal Justice, Correctional Institutions Division, | § § § § § § |
| Respondent. | § |

## MEMORANDUM OPINION
### and
### ORDER

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner, Roberto Sanchez, a state prisoner incarcerated in the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ), against Lorie Davis, Director of TDCJ, respondent. After having considered the pleadings, state court records, and relief sought by petitioner, the Court has concluded that the petition should be denied.

### I. Procedural History

In June 2009 petitioner was indicted in Tarrant County, Texas, Case No. 1152436D, for the murder of Sergio Gonzalez. (Clerk's R. 6, ECF No. 9-13.) Following a jury trial, the jury found petitioner guilty and assessed his punishment at seventy

years' confinement and a $10,000 fine. (*Id.* at 91.) Petitioner appealed his conviction, but the Second District Court of Appeals of Texas affirmed the trial court's judgment, and the Texas Court of Criminal Appeals refused his petition for discretionary review. (Mem. Op. & Dkt Sheet, ECF Nos. 9-4 & 9-2, respectively.) Petitioner also filed a state postconviction habeas application challenging his conviction, which was denied without written order by the Texas Court of Criminal Appeals on the findings of the trial court. (State Habeas R., Action Taken, ECF No. 10-7.) This federal petition followed.

The state appellate court summarized the background facts of the case as follows:

> Sanchez and his friend drove to a Fort Worth nightclub where Sanchez's two cousins, Ingrid and Dilcia, worked. Dilcia spent most of the evening drinking and talking with Sergio Gonzalez, a customer. Around closing time, Dilcia told Sergio that she was leaving with Sanchez, Ingrid, and Sanchez's friend.
>
> Sergio, upset that Dilcia was leaving with Sanchez, confronted the group in the parking lot as they prepared to drive away, shouting expletives and banging on the car's window. Sanchez and his friend got out of the car, and, after exchanging heated words with Sergio, Sanchez pulled a knife from his pocket. Sergio then fled to a parking lot next door as Sanchez chased him with the knife. Sanchez caught up to Sergio near an ice machine across the parking lot and, as Sergio leaped backwards to avoid the knife, Sanchez stabbed him once in the chest.

2

Before trial, the State informed the court and Sanchez's counsel that Dilcia, Ingrid, and Sanchez were in the country illegally, and during Dilcia's testimony, when the State asked her if Sanchez was in the country illegally, Dilcia said that he was. At the close of evidence, Sanchez requested jury instructions on self-defense, defense of third persons, and necessity. The trial court denied the request, finding that the instructions had not been raised by the evidence.

(Mem. Op. 1-2, ECF No. 9-4.)

## II. Issues

In four grounds for relief, petitioner complains of ineffective assistance of trial counsel. (Pet. 6, ECF No. 6-7.)

## III. Rule 5 Statement

Respondent believes that petitioner has sufficiently exhausted his state court remedies as to the claims raised and that the petition is neither time-barred nor subject to the successive-petition bar. (Resp't's Answer 4, ECF No. at 11.) 28 U.S.C. § 2244(b), (d).

## IV. Discussion

### *Legal Standard for Granting Habeas Corpus Relief*

A § 2254 habeas petition is governed by the heightened standard of review provided for by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state

court arrives at a decision that is contrary to or an unreasonable application of clearly established Supreme Court precedent or that is based on an unreasonable determination of the facts in light of the record before the state court. *Harrington v. Richter*, 562 U.S. 86, 100-01 (2011); 28 U.S.C. § 2254(d)(1)-(2). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000). Further, when the Texas Court of Criminal Appeals denies a federal claim in a state habeas corpus application without written opinion, a federal court may presume "that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to

4

the contrary" and applied the correct "clearly established federal law, as determined by the Supreme Court of the United States" unless there is evidence that an incorrect standard was applied, in making its decision. *Johnson v. Williams*, — U.S. —, 133 S. Ct. 1088, 1094 (2013); *Harrington*, 562 U.S. at 99; *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2004).

### *Ineffective Assistance of Counsel*

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel, a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689.

The Supreme Court emphasized in *Harrington v. Richter* the

manner in which a federal court is to consider an ineffective assistance of counsel claim raised in a habeas petition subject to AEDPA's strictures:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

562 U.S. at 101 (quoting *Williams*, 529 U.S. at 410). Accordingly, it is necessary only to determine whether the state courts' rejection of petitioner's ineffective assistance claims was contrary to or an objectively unreasonable application of *Strickland*. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *Kittelson v. Dretke*, 426 F.3d 306, 315-17 (5th Cir. 2005); *Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003).

Petitioner asserts his trial counsel was ineffective as follows:

(1) failing to present evidence to support the theories of self-defense, defense of a third person, and necessity;

6

(2) failing to request a jury instruction on sudden passion during the guilt/innocence phase of trial;

(3) failing to object when the prosecutor asked a state's witness whether petitioner was an illegal alien; and

(4) failing to request an instruction on sudden passion during the sentencing phase.

(Pet. 6-7, ECF No. 1.)

In an affidavit filed in the state habeas proceedings, lead counsel, Eloy Sepulveda, licensed to practice for over thirty years, testified generally regarding his representation of petitioner and specifically in response to petitioner's claims, in pertinent part, as follows:

> Defendant ROBERT SANCHEZ was arrested April 1, 2009, and on April 2, 2009, I was court-appointed to represent ROBERTO SANCHEZ. On April 16, I wrote a letter in Spanish to the Defendant at the Tarrant County Jail. Then on April 22, I spoke to the Defendant by phone. On June 18, 2009, I obtained a court order appointing an investigator, and by June 23, I had obtained 115 pages of investigative reports. I gathered some of the reports and sent them to the investigator on July 1, 2009, with instructions. On July 3, 2009, my investigator interviewed the Defendant in the jail. On July 7, 2009, I met with the investigator to discuss the Defendant's case. I continued to obtain evidence including videos of interviews done with the Defendant and other witnesses. I obtained a court order for the release of the Grand Jury transcript of two (2) witnesses' testimony. I filed five (5) pretrial motions in anticipation of trial. All together, I obtained from the State, a total of 15 CDs/DVDs consisting of interviews with the Defendant and witnesses, and some crime scene photos. Prior to trial, I spent over 100

hrs. working on this case over a three-year period.

. . .

My investigator started by locating two witnesses (both female cousins of the Defendant) that were present at the scene of the crime and who had also testified before the Grand Jury. These witnesses were interviewed by my investigator and his findings were given to me. Their testimony was very incriminating-sobering and vivid. Eventually, I also contacted an aunt of the Defendant. She was the only family that the Defendant had in the United States.

I discussed with the Defendant in jail the offer being made to him of 25 yrs TDC. During these visits I also played the CDs of the interviews given by his two cousins who were witnesses to the crime. I translated to the Defendant the transcribed statements made by these same two witnesses to the Grand Jury. Each time, the Defendant rejected the 25 years and said he wanted five(5) years, or else he wanted a trial.

I met with my investigator and we both went to the crime scene where we took pictures, and spoke to people with knowledge of the crime scene and property. Later, I personally went to the home where one of the cousins, a key witness, was living and interviewed her. Her testimony was very damaging and incriminating to the Defendant as she was a witness to the entire incident and could testify about what the Defendant said after the incident and the incriminating words said by the Defendant.

Later we located other witnesses and interviewed them though they could not identify the Defendant. These witnesses also were at the scene and saw someone run after the victim for about 75 yards and corner him and make a stabbing motion towards the victim. They also saw that same person run back to a car that came by and picked him up and sped away.

Before the defendant was arrested, he was

interviewed by the detective and the Defendant admits that he stuck a knife into the chest of the victim. As the evidence became more and more clear, I explained and showed the Defendant the enormous amount of evidence against him and how it all made it very difficult to defend him. I met with him more than nine (9) times, often for two or more hours trying to get him to understand the strong evidence that existed against him. I also spoke to his aunt, with the Defendant's permission, and explained to her the overwhelming evidence against him. She agreed that he should not go to trial, so I arranged for her to visit the Defendant since she did not have transportation. She spoke to him and begged him to accept a plea deal. But the Defendant refused to change his mind. The Defendant also told me that he did not care what happened to him. He said he had no desire of being deported more quickly since he had nothing worth going back to his country of Honduras.

    I told him that to raise any defenses at trial, he would do that best by testifying. I explained that he could testify about being frightened or provoked and put in fear of his life. But he told me that he was never scared or afraid of the victim, or the situation. The Defendant said he did not want to testify in the trial, but that he would let me know at the time of trial if he changed his mind. The Defendant did testify at his suppression hearing, which was during the trial. When he ultimately decided he would not testify during the trial on the merits, I had already done all I could through the cousins, the State's witnesses, but it was imperative that the Defendant testify if he wanted to raise any defenses. This was something I could not get the Defendant to understand. Yet, strangely enough, I was able to convince him to testify at the motion to suppress hearing. I thought then that the Defendant might agree to testify to his defense.

    I had already filed a motion to suppress the Defendant's confession made to the police in the event the Defendant did not testify. When it appeared before trial that he might not testify, I proceeded with the

9

motion to suppress. In the process of telling me before trial that he didn't want to testify, he also said he didn't care what happened. He did agree to testify as to the facts surrounding his interview and arrest, but when the State rested, he chose not to testify in his own defense. Since I was not sure that he would testify, my legal strategy became to do something, and, at the least, attack the evidence and credibility of the witnesses. At that point also, one of the witnesses who was in the car, and whom I had re-interviewed a few days before trial at her home, told me that she had lied to the Grand Jury and that she did not hear or see the Defendant do or say anything incriminating, and that her cousin had lied also. During the trial, the motion to suppress was granted and that removed the confession made by the Defendant to the detective. That only left the two cousins who were in the car and who had previously made statements to the Grand Jury recounting the Defendant's admission of the crime and his lack of fear or remorse. However, even though just a few days before, she had told me that she had lied and that her cousin had also lied, when she testified at the trial and in the presence of the jury, she changed her story and repeated the exact same thing that she had told the Grand Jury and incriminating the Defendant. When I questioned her about what she had told me earlier, she admitted that she lied to me but that the truth was what she told the Grand Jury and what she was now also testifying to the jury. When asked why she would lie to me, she said she did not want to talk to me so she just told me what she believed I wanted to hear. I was able to show the jury her inconsistencies. Yet, her testimony was very strong and was also supported by her earlier sworn Grand Jury testimony.

. . .

In response to the first reason given of failing to present EVIDENCE in support of the theories of self-defense, defense of third persons, and necessity, I submit the following.

As counsel for the Defendant, I urged Defendant to testify if he clearly wanted to raise the issue of self-defense, defense of third persons, and necessity. However, the Defendant refused to testify, thereby tying my hands. Through cross-examination of the two State's witnesses (the Defendant's cousins), I made an effort to establish facts so as to try to raise these defenses. These witnesses would not and did not testify that the Defendant was in fear of his life, or that he felt threatened. Only the Defendant could do that. Since he was not going to testify, his statement to the detective, if admitted, did nothing but confirm the lack of provocation. His statement also would show that he and his friend, the driver, were sufficient to defend themselves, and he also admitted that the deceased ran away when the deceased saw his friend get knocked down; that it was then that he decided to chase the decedent across a vacant lot and ultimately stab him in the heart. Therefore, I made the decision that we had a better chance if we won the motion to suppress which I believed we would, and we did. Then I could try to attack and use the testimony of the two witnesses in the car (the cousins) to our benefit. Also, these two witnesses were without a place to live and not from this country so there was the possibility that they would not be available for trial.

In response to the second reason of failing to request a jury instruction on sudden passion during the guilt/innocence phase of the trial, I submit the following:

For offenses after September 1, 1994, the question of whether a Defendant has acted under the influence of sudden passion arising from an adequate cause is an issue of punishment, not of guilt/innocence.

In response to the third reason alleged of failing to object when the prosecutor asked the State witness whether or not Sanchez was an illegal alien, I submit the following:

When the State introduced a response from a

State's witness about the Defendant's status, I did not object as I believed that if the Defendant testified he would, on his own, offer that information. The strategy would be that he wanted to be up front and truthful about himself in support of his testimony being credible. I was prepared to object to the question if it was repeated at any other time so as not to be used to appeal to any prejudice. So once it was in one time, I made sure that it was not repeated or referenced again. The State never again referenced the Defendant's status through evidence or in closing. The Defendant ultimately chose not to testify. Nevertheless, this did not result in a fundamental error nor was it harmful. The erroneous admission of evidence is harmless unless the error probably caused the rendition of an improper judgment. Probable error is not subject to precise measurement, but it is something less than certitude; it is a matter of judgment drawn from an evaluation of "the whole case from *voir dire* to closing argument, considering the state of the evidence, the strength and weakness of the case, and the verdict."

All cases that can be presented to show harm involve cases where there was the repeated injection into the case of the Defendant's . . . illegal immigrant status (that) was plainly calculated to inflame the jury against him. "In contrast, here in this Sanchez case, his illegal status was mentioned only once during the entire proceeding, and the State did not predicate its trial strategy or shape its closing argument around that status." Here in this case, the evidence against the Defendant was clear, unrebutted, overwhelming, and convincing. The strength of the case was very clear. The error of admission of the illegal status had no impact in the judgment rendered. The Appellate Court in this case further noted that although they recognized the non-objection by the defense, they made it clear that they did not "condone in any way the State's decision to introduce Sanchez's illegal status during the guilt/innocence phase of trial."

Also, there is no clear evidence in the record

12

that the evidence of the Defendant's illegal status resulted in a more severe sentence. The purported harm is mere speculation regarding what the jury might have considered. The Defendant cannot identify any actual harm. Nothing in the record supports the assertion that the jury increased his sentence based on the knowledge of his illegal status. That the error occurred is not proof that it contributed to his conviction or punishment. Sanchez has not presented facts nor affidavits in support of his requested relief. He has only presented conclusions and his sworn allegations alone are not sufficient to prove his claims.

In response to the fourth reason of failing to request an instruction regarding sudden passion during the punishment phase, I submit the following:

I researched the issue and found not a scintilla of evidence that justified a request for a charge of sudden passion in the facts presented.

My research found that with respect to sudden passion, the cases are clear that something more than the presence of simple fear is required. For a claim of fear to rise to the level of sudden passion, there must be evidence that the Defendant's state of mind rendered him incapable of cool reflection. A sudden passion charge should not be given absent some evidence of the condition of the accused's mind at the time of the offense. Courts have stated that one is not free to recognize the requisite heightened emotional state by implication. "In other words, (sudden passion) is not available to one whose actual emotional responses are aberrational in this society." The breaking of one's car windows is not adequate in this society to justify a killing." "Without legally adequate cause, no amount of subjective passion will justify submission of (sudden passion.)"

In the present case, Defendant Roberto Sanchez never testified, so nothing was offered by him that described his emotional state. Even the statements by the two witnesses in the car did not indicate any

degree of "anger, rage, or resentment, or terror in a person of ordinary temper necessary to create adequate cause." Again one is "not free to recognize the requisite heightened emotional state by implication."

Before trial, when I asked the Defendant if he was scared or frightened he told me "no." When I asked him if he became "scared" or "angry," he said "no." Also, unfortunately, he did not testify because he chose not to testify, so the jury never heard from him even admit the charge and/or describe how he felt emotionally at the time of the offense. The only evidence was from the cousin witnesses in the car. One of . . . them testified that the only confrontation the Defendant had with the victim was an exchange of words and that the Defendant pulled a knife and chased down the victim and that she saw a stabbing motion. In fact, the only emotion she described of the Defendant was when he returned to the car, when she said he acted happy, and he told her "that it felt good to kill somebody."

Based on all the above, I made the decision that there was not an adequate provocation nor evidence of any passion or emotion to support any rational jury making findings of sudden passion because the evidence was "so weak" and actually absent of any evidence that demanded the charge of sudden passion be requested.

(State Habeas R., 50-55, ECF No. 10-9) (citations omitted) (emphasis in original).

The state habeas court adopted the state's proposed findings of fact, based largely on counsel's affidavit, and, applying the *Strickland* standard, found that counsel's chosen defense was the result of reasonable trial strategy and that petitioner had failed to demonstrate ineffective assistance of counsel or show a reasonable probability that the result of his trial would have

14

been different had counsel presented more evidence; requested a sudden passion jury instruction during the guilt/innocence phase of trial; objected to the single reference to petitioner's illegal status; or requested a sudden passion jury instruction during the punishment phase of trial. (*Id.* at 66-67.) The Texas Court of Criminal Appeals in turn adopted the trial court's findings and presumably applied the *Strickland* standard in denying petitioner's state habeas application. (*Id.*, "Action Taken," ECF No. 10-7.)

Absent clear and convincing evidence in rebuttal, this court must defer to the state courts' factual findings. Applying the appropriate deference, and having independently reviewed petitioner's claims in conjunction with the state court records, the state courts' application of *Strickland* was not unreasonable, particularly in light of the overwhelming evidence of petitioner's guilt. Petitioner's claims are largely conclusory, with no legal and/or evidentiary basis, and involve strategic and tactical decisions made by counsel, both of which generally do not entitle a state petitioner to federal habeas relief. *See, e.g.*, *Strickland*, 460 U.S. at 689 (holding strategic decisions by counsel are virtually unchallengeable and generally do not provide a basis for postconviction relief on the grounds of

ineffective assistance of counsel); *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue.").

Counsel explained to petitioner the weaknesses and problems associated with petitioner's theories of self-defense, defense of third parties, and necessity, however petitioner asserts that counsel should have investigated and searched for evidence in support of the defensive theories. (Pet'r's Reply 4, ECF No. 14.) Clearly, counsel gathered a substantial amount of information in petitioner's case, and petitioner fails to point to any evidence known to counsel that would have led a reasonable attorney to investigate further. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). Counsel cannot produce evidence out of thin air to support a defensive theory where none exists. As found by the state habeas court, the testimony of the state's witnesses, including the testimony of petitioner's cousins, did not support petitioner's defensive theories; thus, petitioner was the only person who might have provided testimony related to those defenses, and he voluntarily chose not to testify. (State Habeas R. 66, ECF No. 10-9.)

Petitioner also asserts that counsel should have used his

16

confession to the police in support of his defensive theories. (Pet'r's Reply 3-4, ECF No. 14.) In his oral statement, petitioner told the detective that the victim was drunk and jealous because he did not believe petitioner was Dilcia's cousin; that the victim "threw a punch" in petitioner's face with his hand; that petitioner was going to get into the car when the victim "threw" another punch at petitioner but missed; and that after the victim threw the second punch, petitioner "followed" the victim with a "little knife" and "cut him once." (Reporter's R., vol. 7, State's Ex. 49, ECF No.9-11.) The state habeas court found that petitioner's statement "established that he chased the victim [who was unarmed] down and killed him," and that counsel's decision to keep the statement out was the result of reasonable trial strategy. (State Habeas R. 66, ECF No. 10-9.) The state court's determination is not unreasonable. Under Texas law, a person is justified in using force or deadly force against another when and to the degree the actor reasonably believes the force or deadly force is immediately necessary to avoid imminent harm or to protect the actor or a third party against the other's use or attempted use of unlawful force or unlawful deadly force. See TEX. PENAL CODE ANN. §§ 9.22, 9.31 & 9.33 (West 2011). Although the reasonableness of a defendant's apprehension of the victim's

use of unlawful force or unlawful deadly force may be raised without the testimony of the defendant, petitioner's statement does not establish his subjective state of mind at the time of the offense or that his state of mind was reasonable. *See Smith v. State*, 676 S.W.2d 584, 586-87 (Tex. Crim. App. 1984).

Further, under the facts of this case, any request for a jury instruction on sudden passion at either phase of the trial would have been futile. Petitioner's criticism of his trial counsel's failure to seek a jury instruction on sudden passion concerns a state law issue that is not subject to federal habeas review. *See Creel v. Johnson*, 162 F.3d 385, 390 (5th Cir. 1998) (citing *Valles v. Lynaugh*, 835 F.2d 126, 127 (5th Cir. 1988)); *Alexander v. McCotter*, 775 F.2d 595, 601 (5th Cir. 1985). Federal courts defer to the state courts on whether such an instruction is warranted. *See, e.g., Valles*, 835 F.2d at 126 ("We defer to the state court in its interpretation of its law, and must accept same, for '[i]t is not our function as a federal appellate court in a habeas proceeding to review a state's interpretation of its own law,' unless that interpretation violates the Constitution." (citation omitted) (quoting *Moreno v. Estelle*, 717 F.2d 171, 179 (5th Cir. 1983)). First, under state law, sudden passion is a matter for the punishment phase. And, second, assuming that the

state courts determined that, based on the evidence presented, no instruction on sudden passion was justified, any such request by counsel would have been denied. Counsel is not ineffective for failing to request a jury instruction to which the defendant is not entitled. *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (providing that counsel is not required to make futile motions or objections).

Finally, petitioner asserts that the state court's determination that no prejudice resulted from counsel's failure to object to the single reference to his illegal status is unreasonable because it poisoned the minds of the jury against him. As proof, he directs the court to a jury note sent to the trial court during deliberations in the punishment phase asking "[i]f prisoner is ever released on parole, will the defendant remain in our country, or would he be deported back to Honduras." (Pet'r's Reply 9, ECF No. 14; Clerk's R. 85, ECF No. 9-13.) "Not objecting" can be a reasonable trial strategy. Furthermore, although the appellate court expressly noted that it did not condone the state's decision to question petitioner about his illegal status, the court specifically noted that the matter was mentioned only once during the entire proceeding and that the state did not predicate its trial strategy or shape its closing

argument around that status. (Mem. Op. 7 n.7, ECF No. 9-4.) Also, counsel explained his motivation for not objecting to the question and stated that he was prepared to object if it was repeated. (State Habeas R. 53-54, ECF No. 10-9.) Although the jury questioned the effect of petitioner's illegal status as it related to his punishment, this court cannot say that the jury note, on its own, is clear and convincing evidence of ethnic or racial bias or proof that petitioner's illegal status had a substantial and injurious influence on the jury's verdict in either phase of petitioner's trial.

For the reasons discussed herein,

The court ORDERS that petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, denied. The court further ORDERS that a certificate of appealability be, and is hereby, denied, as petitioner has not made a substantial showing of the denial of a constitutional right.

SIGNED May 17, 2017.

JOHN McBRYDE
UNITED STATES DISTRICT JUDGE